IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ANGEL CARTAGENA, | ) CASE NO. 7:21cv00539 |
|     Plaintiff, | ) |
| v. | ) MEMORANDUM OPINION |
| | ) |
| ALLEY LOVELL, *et al.*, | ) By: Robert S. Ballou |
|     Defendants. | ) U.S. Magistrate Judge |
| | ) |

Angel Cartagena, a Virginia inmate proceeding *pro se*, filed this civil rights complaint pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). He alleges that the defendants assigned him to a mental health unit with restrictive conditions and programing, in violation of due process and the Eighth Amendment. After review of the record, I conclude that the defendants' motion to dismiss must be granted.

**I. Background**

At all times related to his claims, Cartagena was confined at River North Correctional Center ("River North"), a prison facility operated by the Virginia Department of Corrections ("VDOC"). In the Amended Complaint, Cartagena identifies the defendants as follows: VDOC Director Clarke; "CCO" of VDOC Robinson; Director of VDOC Secure Diversionary Treatment Programs ("SDTP") Lovell; VDOC Western Regional Administrator Manis; Madsen, who is "charged with Institutional Classification Transfers" for VDOC inmates; Unit Manager Dowell, assigned to SDTP units A-1 and A-2 at River North; River North Warden Kanode; Dr. Haynes, psychiatrist for the River North SDTP units; and River North Chief of Housing and Programing Kilbourne. Cartagena asserts that Lovell, Dowell, Dr. Haynes, and Kilbourne serve as members of the Multi-Institutional Treatment Team ("MITT") that oversees the SDTP units. *See* Am.

Compl. ¶¶ 4, 6, 16-20, 23, 25, 28, ECF No. 14.  Cartagena alleges the following sequence of facts on which he bases his claims.

Cartagena was diagnosed and treated for serious mental illnesses ("SMI") as early as age twelve and began taking medications for mental illness around that same time.  He has been treated, hospitalized, and even involuntarily committed for medical treatment of SMI multiple times.[1]  His lawsuit focuses on one period during his incarceration.  On November 22, 2019, defendants Lovell and Madsen authorized Cartagena's transfer to the River North SDTP unit.  They did not obtain a court order directing his assignment there, and Cartagena did not consent to the transfer.  In the SDTP unit, Cartagena was isolated in his cell twenty-one hours per day.  He never left his cell without being fully strip searched, placed in shackles and handcuffs attached to a "dog leash," and escorted by two officers.  *Id.* ¶ 10.  To participate in any programming activity, he would be handcuffed and shackled to a "[s]ecured chair."  *Id.*  He received outside recreation time only in a recreation cage.  Inmates in SDTP were not allowed "anywhere near other" inmates and could not attend religious services or hold a job.  *Id.*  While in SDTP, Cartagena could make only four phone calls per month and could not possess some personal property items.

Attached to Cartagena's response to the defendant' motion are copies of informal complaints and grievances he filed about his detention in the SDTP unit,[2] contending that the isolation he experienced in that housing unit was inappropriate for an inmate like himself who

---

[1] Cartagena states that he has been diagnosed "Borderline Personality Disorder, Anti-Social Personality Disorder, Schizo-Affective Disorder, Schizophrenia, and Bipolar Disorder Type II."  Am. Compl. ¶ 7, ECF No. 14.

[2] Because Cartagena attached these same documents to his original complaint in this case, ECF No. 1, I will consider them as incorporated by reference into the amended complaint now before the court.

was diagnosed with SMI.  In a May 2020 response to Cartagena's informal complaint, an officer wrote:

> The [SDTP] is designed with SMI offenders in mind.  Offenders are placed in the [SDTP] because they meet the criteria for Serious Mental Illness and they often engage in assaultive, disruptive, and/or unmanageable behaviors.  Every effort will be made to manage their behaviors within the units.  If the offender continues to endanger others due to assaultive or destructive behavior after other interventions have been tried, including use of restraints or placement in an observation room, . . . the offender may be classified to Restrictive Housing.

Resp. Opp'n Ex., at 17, ECF No. 20-3.  In an August 2020 response to another Cartagena informal complaint about SDTP conditions, an officer wrote: "You were referred to the SDTP program by the MITT team due to your inability to function in GP [General Population].  You are free to refuse any and all programming.  You do not[,] however, decide where you are housed."  *Id.* at 34.

Cartagena was detained in SDTP for more than eighteen months.  He alleges that SDTP living conditions caused him to "suffer[ ] from physical and psychological injuries."  Am. Compl. ¶ 10, ECF No. 14.   He claims that conditions caused "sensory deprivation" and "lack[ of] physical and social points of reference  to ground [him] . . . into reality itself."  *Id.*

Cartagena submits a copy of a "notice he sent to the defendants in August 2020, complaining that his detention in SDTP was unlawful involuntary commitment and giving them sixty days to move him to a general population setting.  *Id.* ¶ 6.  Among other things, this notice specified that

> Detention in a li[c]ensed psychiatric unit or facility for mental health services was not and is not a part of [Cartagena's] (1) sentencing order for the criminal conviction or (2) a part of the order for involuntary commitment pursuant via Due Process and addition order not made a part of his sentencing order. . . . [I]t is not "lawful" to detain [Cartagena] in the operating programs without [his] voluntary consent, involuntary commitment Judicial order or a part of his sentencing order.

Resp. Opp'n Ex., at 4, ECF No. 20-1.  The defendants failed to move Cartagena out of the SDTP in response to this notice.  Am. Compl. ¶ 6.

Around one o'clock on the morning of April 24, 2021, Cartagena "swallowed a toothpaste tube and electrical wirings in a[n] attempt to end his life by choking." *Id.* ¶ 11. He "then began cutting himself with a razor deeply in his right forearm." *Id.*  Crying and thinking of his family, Cartagena told the booth officer that he was suicidal.  Officers immediately came to his cell and called a nurse, who said he needed stitches.  At the hospital, Cartagena refused treatment.  Back at River North, officers placed him in five-point restraints to prevent further self-harm.  He then complained of severe stomach pain.  Officers took Cartagena back to the hospital, where he underwent surgery to extract the objects from his stomach.  A month later, officials transferred him to Wallens Ridge State Prison ("Wallens Ridge"), where he developed "psychosis d[ue] to being isolated and he began to display biz[ar]re behavior." *Id.* ¶ 11.  In mid-August 2021, he attempted suicide twice by cutting his arm with a razor.  On August 31, 2021, officials involuntarily committed Cartagena to Marion Correctional Treatment Center ("Marion") for mental health treatment.

Cartagena filed this lawsuit in October 2021, challenging his past detention in the River North SDTP unit.  He asserts that "[b]eing isolated for long periods of (18) months and (5) days exact was very insalubrious to [his] mental health and safety." *Id.* ¶ 8.  Liberally construed, his Amended Complaint asserts that by placing him in the SDTP unit and/or by failing to order his removal from that unit, the defendants violated his rights as follows: (1) his right to free exercise of his religious beliefs; (2) his Eighth Amendment protection against harmful living conditions; (3) his Eighth Amendment right to necessary mental health treatment for serious mental health needs; (4) his "substantive" due process right to freedom from bodily restraint and involuntary

mental health treatment without a court commitment order; (5) his right to procedural due process before being deprived of a state-created liberty interest in avoiding the restrictive conditions of the SDTP unit; and (6) his right not to be discriminated against on the basis of his mental health disability, in violation of the ADA and the RA. *See gen. id.* ¶¶ 12-31. As relief, he seeks monetary damages and injunctive relief to enjoin the defendants from returning him to the SDTP unit. The defendants have filed a motion to dismiss, and Cartagena has responded, making the matter ripe for consideration.

## II. Discussion

### A. Motion to Dismiss Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. When deciding a motion to dismiss under this rule, the court must accept as true all well-pleaded factual allegations and draw all reasonable factual inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[3] In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[3] I have omitted internal quotation marks, footnotes, alterations, and citations here and throughout this memorandum opinion, unless otherwise noted.

(2009). The analysis of a complaint's plausibility is "context-specific" and requires "the reviewing court to draw on its judicial experience and common sense." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Although the court must accept the plaintiff's factual allegations as true, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Twombly*, 550 U.S. at 570. Thus, the court is not bound to accept as true a legal conclusion couched as a factual assertion. *Iqbal*, 556 U.S. at 678.

**B. Religious Rights**

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). In Claim (1), Cartagena alleges that while assigned to the SDTP unit, he was "not allowed to attend religious services," even before the COVID-19 pandemic began. Am. Compl. ¶ 10, ECF No. 14. He claims that this restriction violated his First Amendment right to exercise his faith. *Id.* ¶ 12.

Inmates "clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). To state a claim under the Free Exercise Clause of the First Amendment, a plaintiff must show (1) that he holds "an honest conviction" that his inability to engage in the prohibited practice violated his religion, and (2) that officials' action substantially burdened his ability to exercise his religious beliefs. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716, 717 (1981). An official's action impermissibly burdens religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 718. Even when a prison policy substantially burdens a prisoner's religious

practice, the policy will not violate the First Amendment if the government can demonstrate that the policy is reasonably related to the achievement of a legitimate penological objective. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). A policy withstands constitutional scrutiny if it meets a four-factor test set out in the *Turner* case: (a) the governmental objective of the policy is legitimate and neutral, and the policy is rationally related to that objective; (b) the inmate has alternative ways to exercise his religion; (c) accommodating the inmate's desired religious practice would impact staff, other inmates, and prison resources; and (d) alternatives are or are not easily available. *Id.* at 89-90.

Cartagena does not state facts meeting any of these elements as required to show a violation of his Free Exercise right. He does not state what his religious faith is or assert how failure to attend religious services in person put substantial pressure on him to violate his religion. Moreover, he does not show that his housing in the SDTP unit prevented him from practicing his religious faith in other ways, such as watching religious services on television, reading religious texts, and praying in his cell. Furthermore, one of his submissions indicates that for much of the time he was in the SDTP unit, no inmates were attending religious services in person because of COVID-19 precautions, which clearly furthered a legitimate penological interest in preventing the spread of the virus. Resp. Opp'n Ex., at 31, ECF No. 20-3. Because Cartagena's Amended Complaint does not state basic facts to support a First Amendment claim that his housing assignment violated his free exercise rights, I will grant the motion to dismiss as to Claim (1).

**C. Harmful Conditions and Mental Health Care**

In Claim (2), Cartagena claims the defendants placed him in the restrictive SDTP living conditions that caused him harm. In Claim (3), he alleges that in so doing, they were deliberately indifferent to his serious mental health needs.

To establish a claim under the Eighth Amendment that officers confined him under harmful conditions, a prisoner must make two showings: (a) that objectively, he was exposed to "conditions posing a substantial risk of serious harm" and suffered a serious injury as a result, and (b) that subjectively, the prison official at issue had a "sufficiently culpable state of mind." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). Under the objective prong of this standard, inmates may not be deprived of "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety," and they may not be subjected to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Helling v. McKinney*, 509 U.S. 25, 32 (1993). The subjective element of the hazardous condition standard requires proof of deliberate indifference —the plaintiff must show that the defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A prison official's deliberate indifference to an inmate's serious medical need, as reflected through the unnecessary infliction of pain through denial or delay of necessary treatment, violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A sufficiently serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). And a prison official is "deliberately indifferent" only if he "knows of and disregards [or responds unreasonably to] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[C]ourts treat an inmate's

8

mental health claims just as seriously as any physical health claims." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). A showing of deliberate indifference in the medical care context requires more than a defendant's alleged errors in judgment or disagreements between the professional and the patient about the proper treatment plan. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Officials with no medical expertise can rightfully rely on mental health providers to determine whether the challenged course of treatment was appropriate for the inmate patient's mental health conditions. *See Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir.1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 854.

Cartagena complains of the restrictive living conditions in the SDTP unit—limited phone calls, leaving his cell only for three hours per day in full restraints after a strip search, activities only while chained to a secure chair or locked in a recreation cage, no chance for a job, and limitations on personal property. He alleges that the conditions in the SDTP unit caused him "severe mental anguish and emotional distress" and unspecified "grievous physical injuries." Am. Compl. ¶¶ 16, 18, 30, ECF No. 14. He does not, however, allege facts showing that any defendant knew the SDTP living conditions themselves would pose a threat to Cartagena's health or safety, or that the conditions alone could cause, or were causing, him physical or emotional injuries. Indeed, Cartagena's submissions indicate that the SDTP unit is designed for inmates like himself, who have been diagnosed with SMI and who have not functioned well in other types of VDOC housing. Resp. Opp'n Ex., at 17, ECF No. 20-3. Even Cartagena's notice to all defendants, asking them to move him out of SDTP within sixty days, did not inform them of any serious mental, emotional, or physical harm that conditions in that unit had caused, or were likely to cause, him. Resp. Opp'n Ex., at 4-6, ECF No. 20-1.

Furthermore, in Claim (3), Cartagena alleges that Dr. Haynes, a psychiatrist, is on the MITT that considers relevant information and determines whether an inmate is properly and safely assigned to the SDTP unit. While other defendants are likely aware that Cartagena has been diagnosed with SMI, he has not alleged facts on which he could show that they knew of any risk that the SDTP unit (designed for SMI inmates) would worsen his mental health conditions. Indeed, since the majority of the defendants do not have medical or mental health expertise, they could lawfully rely on Dr. Haynes' professional judgment in deciding how best to house Cartagena under conditions that could safely accommodate the potential harms that his mental illnesses themselves posed. *Miltier*, 896 F.2d at 854. Thus, I cannot find that any of these defendants knew that SDTP living conditions posed a substantial risk of serious harm of any kind to Cartagena—physically, emotionally, or medically, or that they acted with deliberate indifference to any such risk. Therefore, I conclude that Cartagena has not stated Eighth Amendment conditions claims against any of them.

I also conclude that Cartagena has not stated any Eighth Amendment claim against Dr. Haynes related to his medical or mental health treatment. In November 2019, Dr. Haynes and the other members of the MITT determined that the SDTP unit met Cartagena's housing needs. Clearly, Cartagena disagreed with this decision and believed that he should be assigned to a general population unit.[4] His own submissions, however, indicate that he had experienced difficulties in the past while assigned to a general population setting. *See* Resp. Opp'n Ex., at 17, ECF No. 20-3. As a psychiatrist reviewing Cartagena's mental health records and past housing

---

[4] Cartagena has asserted that unspecified "treating professionals recommended treatment in a less restrictive setting." Am. Compl. ¶ 30, ECF No. 14. He does not provide evidence of these purported recommendations, when they were made, or under what circumstances. Thus, I find that this allegation represents nothing more than another disagreement with Dr. Haynes' medical judgments. Moreover, it is an unsupported and conclusory allegation that I need not accept as true in considering the motion to dismiss. *Iqbal*, 556 U.S. at 678

assignments, Dr. Haynes made a professional judgment that the SDTP unit was the appropriate housing unit for this inmate in November 2019 and continuing into 2021. Cartagena's mere disagreement with Dr. Hayne's professional assessment of the appropriate housing situation in light of his SMI and past housing history is not sufficient to support a claim that the doctor knew SDTP conditions presented a substantial risk of harm to Cartagena. *Jackson*, 775 F.3d at 178.

I also find no factual support for an Eighth Amendment claim that any defendant deprived Cartagena of medical or mental health care. The only physical health issues he describes from his time in the SDTP unit are the ones he caused himself through his purported suicide attempts, for which officials promptly treated him. Cartagena clearly believes that STDP conditions aggravated his mental health conditions. But he does not allege that while confined in that unit, he received no separate mental health care, such as medication and regular examinations by mental health professionals. Again, Cartagena's disagreement with Dr. Haynes' medical judgment to place him in the STDP housing unit is not sufficient support a finding that the doctor or any of the other defendants were deliberately indifferent to Cartagena's mental health needs or safety. For the stated reasons, I will grant the motion to dismiss as to Claims (2) and (3) as to all defendants.

**D. Due Process**

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. A plaintiff claiming a due process violation "must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). If a plaintiff fails to plead adequately a protected liberty interest at stake, the due process inquiry ends. There is no need to examine

11

what process is due if the plaintiff fails to identify a constitutionally protected interest. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, or it may arise from an expectation or interest created by state laws or policies." *Id.* at 221.

Cartagena, as "a convicted prisoner . . . does not have an inherent, constitutionally protected liberty interest in release from solitary confinement" or in remaining under general population prison conditions. *Smith v. Collins,* 964 F.3d 266, 275 (4th Cir. 2020); *Stephany v. Wagner*, 835 F.2d 497, 499 (3d Cir.1987) ("the Due Process Clause does not give a prisoner a liberty interest in remaining in the general prison population"). Nevertheless, an inmate can have a liberty interest in freedom from restraint that "exceed[s] the [inmate's] sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 487-88 (1980) (regarding involuntary transfer to mental hospital); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (regarding administration of psychotropic drugs)). "A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections." *Vitek*, 445 U.S. at 493–94. Specifically, the Court found that transferring a mentally ill prisoner to the mental hospital at issue "had some stigmatizing consequences which, together with the mandatory behavior modification treatment to which [he] would be subject [there], constituted a major change in the conditions of confinement amounting to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."[5] *Id.* at 488. Thus, an

---

[5] The factual history behind the *Vitek* decision reflects that the plaintiff in that case was not only transferred to a state hospital operated for the treatment of "emotional and mental disorders, but was also

12

inmate's involuntary transfer to a mental hospital for psychiatric treatment "implicate[s] a liberty interest protected by the Due Process Clause" itself. *Id.* at 494.

A second type of constitutionally protected liberty interest can arise under state law. "[T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84.

Cartagena apparently contends that the SDTP unit is the equivalent of the mental hospital in *Vitek*. He alleges that he did not consent to be housed in this "secure psychiatric unit," where he was "denied the opportunity to not participate in mental health treatment, care, and services" included in the unit's programming. Am. Compl. ¶ 5. He complains that "being detained in a licensed psychiatric unit was not part of his sentencing order" and was not otherwise ordered by any court. *Id.* On this basis, he asserts that he had "a substantive liberty interest to safety, freedom from" confinement in the SDTP unit against his will. *Id.* ¶ 18.

I cannot agree that Cartagena's detention in the SDTP unit triggered a liberty interest protected under the Due Process Clause itself, as he alleges. His situation is clearly distinguishable from the facts of *Vitek*. Moving Cartagena within the prison system to the SDTP unit did not transfer him to a dedicated mental health treatment facility or implicate the

---

likely involuntarily subjected to treatment there, including the use of psychiatric drugs. *See, e.g., Miller v. Vitek*, 437 F. Supp. 569, 572 (D. Neb. 1977) ("Patients there, including inmates transferred from the Penal Complex, are frequently required to participate in behavior modification programs and to take whatever medication may be prescribed for them."). In contrast, the prison medical unit in that case imposed protective and restrictive conditions for mentally ill inmates, but it did not subject them to involuntary psychiatric treatment. *Id.*

13

stigmatization that concerned the courts in the *Vitek* case.[6]  Cartegena also does not allege that the programing in the SDTP unit involved any type of involuntary medication.  Rather, he admits that he has been voluntarily taking medications for his mental illnesses for years.  While Cartegena complains that he lost privileges if he refused participation in SDTP programming, I cannot find that putting him to such a choice regarding privileges constituted the type of involuntary mental health treatment that created a liberty interest in the *Vitek* case.

Virginia mental health statutes also do not support Cartagena's claim of a liberty interest in avoiding assignment to the SDTP.  Title 37.2 of the Virginia Code governs the Commonwealth's Behavioral Health and Developmental Services ("Department"), including court procedures required for involuntary commitment of an individual for inpatient treatment of mental illness.  *See* Va. Code Ann. §§ 37.2-100, *et seq*.  These statutes do not require court proceedings and a court commitment order as a prerequisite for VDOC officials to move an inmate to the SDTP unit.  Rather, the term "facility" as defined for purposes of Title 37.2 "means a state or licensed hospital, training center, psychiatric hospital, or other type of residential or outpatient mental health or developmental services facility.  When modified by the word 'state,' 'facility' means a state hospital or training center operated by the Department," not by the VDOC.  Va. Code Ann. §§ 37.2-100.  Similarly, the term hospital, "when not modified by the words 'state' or 'licensed,' means a state hospital and a licensed hospital that provides care and treatment for persons with mental illness." *Id.*  Licensed hospital "means a hospital or institution, including a psychiatric unit of a general hospital, that is licensed pursuant to the

---

[6] The Amended Complaint alleges that officials placed Cartagena in the River North SDTP unit on or about November 22, 2019, but it does not state whether he was already housed at River North or was moved from another VDOC prison facility to that SDTP unit.

14

provisions of this title." [7] *Id.* Cartagena has not stated facts showing that the SDTP unit at River North meets any of these definitions. Thus, I conclude that the defendants did not deprive Cartagena of procedural protection to which Virginia's mental health statutes entitled him by failing to have a hearing and obtain a court order before transferring him to the SDTP unit.

A VDOC operating procedure could also conceivably create a protected liberty interest in avoiding a certain type of detention. To establish such a state-created liberty interest, the inmate must show (1) "that there is a basis for an interest or expectation in state regulations for avoiding such confinement," and (2) "that the conditions impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Smith,* 964 F.3d at 275. Cartagena's due process claim fails on the first step. He does not point to any VDOC procedure under which he enjoyed an "interest or expectation" in avoiding SDTP confinement in 2019 to 2021. *Id.* Although I have an obligation to liberally construe his *pro se* pleadings, I "cannot be expected to construct full blown claims from sentence fragments" or assume "the improper role of an advocate seeking out the strongest arguments and most successful strategies" for the *pro se* party. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). Furthermore, even if Cartagena could show that SDTP conditions imposed atypical hardship in his living conditions compared to the general population conditions so as to create a protected liberty interest, his submissions indicate that there are "multiple levels of review concerning" an inmate's placement in the SDTP unit, including the Mental Health Clinical Supervisor, the Regional Operations Chief, and the MITT. Resp. Opp'n Ex., at 23, ECF 20-3. Cartagena has not stated facts

---

[7] Although Cartagena characterizes SDTP as "a licensed psychiatric unit funded by the Federal Government," he neither alleges facts nor cites law that would support this conclusory allegation. Am. Compl. ¶ 25, ECF No. 14. In considering a motion to dismiss, I am not bound to accept as true such a legal conclusion couched as a factual assertion about the alleged licensing of the prison's housing unit. *Iqbal*, 556 U.S. at 678.

15

suggesting that the review processes provided are inadequate to prevent arbitrary deprivation of liberty interests.

I conclude that Cartagena has not stated facts showing that he enjoyed a constitutionally protected liberty interest against assignment to or continued detention in the SDTP unit at River North, or that he was deprived of any such liberty interest without due process. Therefore, I will grant the defendants' motion to dismiss as to Claims (4) and (5), alleging due process violations.

### E. The ADA and RA

In Claim (6), Cartagena asserts that "[m]ental illness is a form of disability and isolation that's unnecessary of a disabled person is a form of discrimination on account of disability in violation of the [ADA] and the [RA]."[8]  Am. Compl. ¶ 30, ECF No. 14.  He contends that all the defendants thus discriminated against him for his disability when they allowed him to be isolated in the SDTP unit instead of placing him in a less restrictive setting more appropriate for his mental health.

"[A] plaintiff seeking recovery for violation of either [the ADA or RA] must allege [facts showing] that (1) [h]e has a disability, (2) [h]e is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [h]e was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of h[is] disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).  Evidence that the plaintiff suffers from a serious disease or mental health illness is not sufficient to show that the condition qualifies as a disability under the ADA or RA.  *See, e.g., Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir.1998) (noting that a diagnosis

---

[8] The ADA and RA "generally are construed to impose the same requirements due to the similarity of the language." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).  Cartagena does not allege any factual or legal basis requiring separate treatment of his claims under these two federal statutes.

16

of post traumatic stress disorder, or PTSD, "is not necessarily a disability contemplated by the ADA" because "[t]he statute requires an impairment that substantially limits one or more of the major life activities").

Cartagena does not state facts demonstrating that his mental illnesses impair his major life activities so as to meet the required definition of a disability. Even assuming that his mental health issues could qualify as a disability under these statutes, however, Cartagena has not alleged facts indicating that, due to this disability, the defendants deprived him of benefits for which he was otherwise qualified. I find no facts suggesting that his mental health issues motivated anyone to exclude him from any prison programming or service. Rather he has alleged that the defendants discriminated against him by assigning him to the SDTP unit when they knew its isolation component was not recommended for the mentally ill. However, the ADA prohibits entities from discriminating *because* of disability; it does not address inappropriate or inadequate treatment for a disability. *See Goodman v. Johnson*, 524 F. App'x 887, 890 (4th Cir. 2013) (citing other cases). I conclude that Cartagena has not stated facts to support any claim that anyone violated his rights under the ADA or the RA. I will grant the defendants' motion to dismiss as to Claim (6).

### III. Conclusion

For the reasons stated, I conclude that the defendants' motion to dismiss must be granted as to all claims. I will also deny Cartagena's motion for appointment of counsel. "[A] litigant in a 42 U.S.C. § 1983 suit has no right to appointed counsel." *Alexander v. Parks*, 834 F. App'x 778, 782 (4th Cir. 2020); *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel in civil cases), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989)). While a district court has

discretion to request that counsel take on representation of a *pro se* and indigent plaintiff upon finding that he "has a colorable claim but lacks the capacity to present it," *Whisenant,* 739 F.2d at 163, that situation is not present here, as I have concluded that Cartegena has failed to state any claim upon which relief could be granted.

    An appropriate order will issue this day. The clerk will send copies of this memorandum opinion and the accompanying order to the parties.

                Enter:  September 29, 2022

                /s/ Robert S. Ballou

                Robert S. Ballou
                United States Magistrate Judge